IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TOMMY STITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:24-cv-1110 (RDA/IDD) |
| | ) |
| STOHLMAN SUBARU OF HERNDON, | ) |
| LLC, d/b/a Stohlman Subaru of Sterling, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Stohlman Subaru of Sterling's Motion for Summary Judgment. Dkt. 33 (the "Motion"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Memorandum in Support (Dkt. 34), Oppositions (Dkts. 41, 47), and Reply (Dkt. 48), this Court GRANTS the Motion for the reasons that follow.

### I.  PROCEDURAL BACKGROUND

Plaintiff Tommy Stith, originally represented by counsel, filed his Complaint on June 26, 2024. Dkt. 1. On September 30, 2024, Defendant filed its Answer. Dkt. 5. That same day, a Scheduling Order issued. Dkt. 7. On October 22, 2024, Magistrate Judge Ivan D. Davis issued the Rule 16(b) Scheduling Order. Dkt. 10.

In January 2025, Plaintiff's counsel sought to withdraw as counsel. Dkt. 18. That motion was granted. Dkt. 19. Thereafter, Plaintiff participated in this action *pro se*.

After discovery, Defendant filed the pending Motion. Dkt. 33. A notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), issued that same day. Dkt. 35 (the "*Roseboro*

1

Notice"). On July 11, 2025, Plaintiff filed his first response to the Motion. Dkt. 41 (the "First Response"), which consists of an "Adverse Actions Timeline" and a discussion of "Earned Pay Given to Others as Retaliation," with eighteen attached exhibits. Dkts. 41, 41-1 to 41-18. On July 22, 2025, Plaintiff filed a second response to the Motion. Dkt. 47 (the "Second Response"). The Second Response consists of emails setting forth Plaintiff's argument, interspersed with other documents appearing to reflect Plaintiff's argument and exhibits, and also attached five exhibits. Dkts. 47, 47-1 to 47-5. On July 28, 2025, Defendant filed its Reply.

## II.    UNDISPUTED STATEMENT OF FACTS

Before analyzing the Motion at issue here, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact. Defendant complied with the Rules governing the procedure by which to set forth undisputed facts, but Plaintiff did not. The Federal Rules of Civil Procedure require a non-moving party to dispute asserted undisputed facts by citing to particular parts of materials in the record or by showing that the materials cited do not support the asserted fact. Fed. R. Civ. P. 56(c). As set forth in the Local Rules and the Rule 16(b) Scheduling Order, "[a] brief in opposition to a motion for summary judgment must include a separately captioned section within the brief address, in numbered-paragraph form corresponding to the movant's section, each of the movant's enumerated facts and indicating whether the non-movant admits or disputes the fact with appropriate citations to the record." Dkt. 10 at ¶ 10(f). In particular, in issuing the *Roseboro* Notice in this matter, the Court directed Plaintiff to "paragraph 10(f) of the Rule 16(b) Scheduling Order" and referred Plaintiff to the relevant rules and his obligation to respond to the Motion. Dkt. 35. Plaintiff's failure to abide by the Rules and the Rule 16(b) Scheduling Order have made it more difficult for the Court to determine what facts are undisputed and what facts are supported

2

by the record.[1]  Indeed, by not appropriately responding to the Motion, which was supported by declarations and other evidence, Plaintiff has failed to dispute the asserted facts and leaves those facts uncontroverted.  This, of course, does not answer the ultimate question of whether such uncontroverted facts entitle Defendant to judgment as a matter of law, which the Court analyzes *infra*.  *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

The Court has reviewed the parties' submissions and determined that the following facts are undisputed:

1. Defendant was a premier family-owned full-service Subaru dealership in Sterling, Virginia.  The Stohlman family also owns another full-service Subaru dealership in Vienna, Virginia.

2. Plaintiff resides in Ashburn, Virginia.

3. In June 2018, Defendant hired Plaintiff as a Sales Consultant at its Sterling location.

4. Plaintiff identifies as African American.

---

[1] A number of the materials submitted by Plaintiff do not appear to be appropriate "record evidence" for summary judgment.  Rather, they are unsworn assertions of fact and/or emails that Plaintiff appears to have written to himself to set forth his argument in opposition to summary judgment; such documents are not appropriately considered as part of the factual record on summary judgment or to create disputes of fact.  *See Bledsoe v. Jenkins*, 1993 WL 425195, at *1 n.* (affirming "because Bledsoe's unsworn statement filed in opposition to Jenkin's motion for summary judgment was insufficient to rebut Jenkin's assertion"); *Williams v. Gilbert*, 2024 WL 1261211, at *4 (W.D. Va. Mar. 25, 2024) ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment,' and that 'unsworn statements do not qualify as affidavits and are not considered by the Court when ruling on a motion for summary judgment.'").  Furthermore, even if they were contained within an affidavit or declaration, Plaintiff's assertions that he was discriminated or retaliated against are insufficient to defeat a motion for summary judgment or create a genuine dispute of fact.  *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting that "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence" cannot create genuine issues of material fact); *Nat'l Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000) (finding "self-serving affidavit" insufficient to defeat motion for summary judgment); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (plaintiff's affidavit "mostly made up of conclusory statements . . . without more is not enough to establish a *prima facie* case of discrimination").  These principles guide the Court's consideration of the materials presented by Plaintiff.

5. As a Sales Consultant, Plaintiff's job duties included answering inbound leads and phone calls, demonstrating automobile capabilities (both new and used), closing sales, and following up with customers.

6. Plaintiff's pay was commission-based.

7. Because Plaintiff's pay was based on commissions, Defendant's Controller would provide him and other employees with the dealership's calculation of the commission owed in advance of pay day, so that the employees could raise any issues with the calculations prior to pay day. Defendant advises its employees that they need to alert Defendant if there are any discrepancies in their paychecks.[2]

8. At all relevant times during Plaintiff's tenure with Defendant, Defendant is unaware of any concern or dispute raised by Plaintiff relating to the accuracy of his paysheets. If Plaintiff raised such concerns, they were fully resolved.[3]

9. Defendant's minimum performance expectation for all of its sales consultants was to sell twelve cars a month.

10. From mid-2020 until Plaintiff's voluntary resignation in April 2023, William James, the General Sales Manager, supervised Plaintiff. James identifies as White. Jamie Dent, Vice President of Sales, was Plaintiff's second-level supervisor. Dent identifies as African American. Michael Rusnak, General Manager, was Plaintiff's third-level supervisor.

---

[2] Plaintiff asserts that "Dawn Cox and profits were placed in slush funds and siphoned off. I sent Counsel Burns and Kemp-Nguyen emails on slush funds and siphoning of gross profits." Dkt. 47 at 28. Because Plaintiff fails to cite to any portion of the record and because the information asserted by Plaintiff does not contradict the asserted fact, Plaintiff has not demonstrated a genuine issue of material fact.

[3] Plaintiff asserts: "There were many and William James interfered with my pay. We have shown many documents to defense. Comptroller was never onsite daily to witness [how] deals were logged. The Vinsolutions report do not match sales logs as leads deals were given to other consultants as retaliation. Defense knows this because I filed motion to compel they [sic] to get my documents. I won [sic] motion so that should tell you deals were stolen from me. Documents to prove." Dkt. 47 at 29. Plaintiff does not provide a citation to any documents, but the Court assumes that Plaintiff purports to rely on the eighty pages contained within docket entry 47-4. A review of that documentation does show that there were changes in assignments amongst consultants, but there is nothing indicating that this was inappropriate as there is no affidavit or declaration explaining what the documents show. Moreover, the asserted information does not contradict the asserted fact: that Plaintiff did not inform Defendant regarding any complaints about his pay. Accordingly, there is no genuine dispute of fact, but the Court will add, *infra*, Plaintiff's asserted fact that at times the designated consultant on a sales lead was changed.

Rusnak identifies as White.  Tia Glenn-Scott, Human Resources Manager, identifies as African American.[4]

11. At times, leads were reassigned from one sales consultant to another, including leads where Plaintiff had a previous business relationship with the customer.

12. Although Plaintiff alleges that James took Plaintiff's sales leads and gave them to other consultants or adjusted (or "charged back") certain commissions due to post-sale service work, Plaintiff does not know how James treated other sales consultants and preferred to stay in his "own bubble."  Plaintiff also has no experience as a sales manager and does not know whether any other sales consultants had leads changed or charged back due to post-sale service work.[5]

13. On April 14, 2023, Plaintiff voluntarily resigned his employment.[6]

---

[4] Plaintiff objects that the "race of others ha[s] no bearing on how discrimination and racial harassment by William James was carried out against [P]laintiff."  Dkt. 47 at 29.  Because Plaintiff does not attempt to controvert the asserted fact, there is no genuine dispute of material fact in this regard.

[5] Plaintiff asserts: "Evidence prove[s] what William James, Micheal Cerqueira, and Tyler Wright did to retaliate against me.  The documents provided by Stohlman proves many deals along with previous book of business assigned to other consultants even when clients came back requesting to do business with me again.  Defense disclosed that Omid Ahmadi knows about my performance."  Dkt. 47 at 30.  Plaintiff cites no record evidence and does not attempt to controvert the asserted fact.  Accordingly, there is no genuine dispute of fact.  Moreover, the Court has previously added Plaintiff's asserted information, which is supported by record evidence, that, at times, leads were reassigned to other sales consultants.

[6] Plaintiff asserts: "By Stohlman leaving the harasser in place there and retaliation occurring daily no reasonable person would have stayed in that job.  Executive Management was awful at conducting genuine investigations.  They actually conducted a racially charged investigation in less than 1 day."  Dkt. 47 at 30.  Plaintiff again cites nothing in support of his assertion.  Plaintiff's First Response contains a timeline of events, but it is not appropriately considered part of the summary judgment record because it is unsworn.  Dkt. 41; *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'").  Even so, the First Response only asserts a single remark related to Plaintiff's race.  Dkt. 41 at 1 (alleging that on January 24, 2022, James called Plaintiff a "Black Motherf****r").  The only other event that Plaintiff alleges was directly tied to his race was on April 8, 2023, when Plaintiff perceived James as glaring at the "only Black man in the room" as he used insulting language and stated "I could only afford to eat chicken and he can get any bone in steak he wanted at Morton's Steakhouse."  Dkt. 41 at 3.  (Plaintiff's use of quotation marks is confusing in this regard because he says that James stated "I" appearing to refer to James, but the implication from the surrounding context is that the "I" refers to Plaintiff.)  Thus, even Plaintiff's summary of facts does not support his assertion that he was being harassed daily

14. At the time of Plaintiff's resignation, Defendant had 44 employees at the Sterling location.

15. Plaintiff admits that Defendant treated its employees well, including Plaintiff. Indeed, Plaintiff said that Defendant was a friendly and family-oriented employer.

16. General Sales Managers at each Stohlman location conduct sales meetings with their staff, usually once per week, but sometimes more often.[7]

17. These meetings discuss the performance of the sales department as a whole and sometimes the sales consultants individually.[8]

18. The Used Car Sales Manager and New Car Sales Manager typically provide updates at these meetings.

19. At the sales meeting, sales consultants are encouraged and reminded of their sales requirements.

20. Defendant also had split deal rules impacting employee commissions. Split deals are transactions that involve multiple sales consultants.[9]

21. Factory buybacks are vehicles repurchased by the automobile manufacturer. Defendant's policy on factory buybacks was that buybacks always had to be handled by a Sales Manager

---

and, in any event, the Court cannot consider it because it is unsworn. Accordingly, there is no genuine dispute of fact.

[7] Plaintiff asserts that there were meetings "every day of the week." Dkt. 47 at 31. Plaintiff does not cite any record evidence to support his assertion. Accordingly, there is no genuine dispute of fact; however, the Court modified the asserted fact to state "sometimes more often" to take into account Plaintiff's assertion.

[8] Plaintiff asserts: "Those meetings were about threats, demands, and singling me out all because my skin is Brown. Stohlman did exit interviews and they knew discrimination, racial harassment, and retaliation occurred. We have the document after the EEOC and office of Civil Rights written by Jaime Dent and Signed by William James." Dkt. 41 at 31. Again, Plaintiff fails to cite any record evidence in support of his assertions. Moreover, even taking into account, Plaintiff's allegations here and in his unsworn timeline, Plaintiff does not explain – outside of the single race-based remark – why he believes his other interactions with James, including the lead changes were based on race. Accordingly, there is no genuine dispute of material fact.

[9] Plaintiff does not attempt to dispute the asserted fact or cite to any portion of the record. Rather, Plaintiff merely provides the commentary that "Split deal means nothing when retaliation is prevalent. Who verified the rules were being followed." Dkt. 47 at 32. Accordingly, there is no genuine dispute of material fact.

6

and Service Manager with the factory.  A sales consultant was never allowed to handle a factory buyback.[10]

22. Defendant handled leads based on business needs, but the bottom-line rule was that no particular sale or lead or client belonged to any sales consultant.  Instead, Defendant's stated policy was that all clients and their information belonged to Cathy Stohlman, the owner, and the Stohlman Group.[11]

23. It is routine in car dealerships that sales leads are shifted amongst the sales staff, and the same was true at Defendant.[12]

24. If an assigned sales consultant is occupied when a customer enters the showroom, the lead is assigned to a sales consultant who is immediately available.[13]

25. If sales consultants fail to utilize their leads efficiently, such as failing to contact existing leads, Defendant will shift new or incoming leads to other sales consultants to ensure that leads are contacted quickly.[14]

---

[10] Plaintiff asserts: "Prior to Covid Subaru of America would send a factory representative to meet with [the] customer and handle that process.  During Covid the factory representative would make contact over email.  [sic] Customer Advocacy Department reached out to me directly as the Gorsky's stated the sales consultant they conducted business with."  Dkt. 47 at 32.  Plaintiff cites no record evidence supporting his assertion.  Moreover, the assertion does not dispute the fact put forward by Defendant regarding Defendant's policies.  The relevance of Plaintiff's assertion is therefore unclear.  Accordingly, there is no genuine dispute of material fact.

[11] Plaintiff asserts that he was told by Dent that "leads were on a round robin."  Dkt. 47 at 32.  Plaintiff again cites no record evidence supporting his assertion.  In his deposition, Plaintiff agreed that the written policy said what is now asserted by Defendant.   Dkt. 34-2 at Tr. 91:2-92:13.   Plaintiff cannot contradict his sworn deposition testimony through unsworn and unsupported assertions.  Accordingly, there is no genuine dispute of material fact.

[12] Plaintiff questions the accuracy of this assertion but does not cite to any record evidence to controvert it.  Accordingly, there is no genuine dispute of material fact.

[13] Plaintiff does not dispute that this occurs and, with respect to "fresh leads," Plaintiff concedes that this is "understandable."  Dkt. 47 at 33.  Plaintiff otherwise argues that it is inappropriate to "take leads a consultant such as myself have called, texted, emailed for consecutive days and we [sic] customer replied given to a consultant who did nothing to earn the commission."  *Id.*  This is argument and unsupported by any citation to the record.  Accordingly, there is no genuine dispute of material fact.

[14] Plaintiff does not attempt to dispute the asserted fact.  Rather, Plaintiff merely asserts: "I know how to follow a follow up schedule in a CRM such as Vinsolutions."  Dkt. 47 at 33.  Accordingly, there is no genuine dispute of material fact.

26. James transferred sales leads away from Plaintiff to other sales consultants and from other sales consultants to Plaintiff.[15]

27. Commissions on vehicle sales are often adjusted based on external factors, such as discounts applied to the transactions, split deals, cleaning, or maintenance and repair costs associated with the transaction. These adjustments impact the income of each person who receives a commission associated with that transaction.[16]

28. Defendant maintains a policy that permits sales consultants to address commission concerns and dispute amounts with their sales managers.[17]

29. Defendant is unaware at this time of any commission concerns or disputes raised by Plaintiff during his employment. Defendant believes that Plaintiff did not disclose any commission concerns or dispute any commission amounts under this policy, or if any commission concerns or disputes were raised, they were fully resolved.[18]

30. Plaintiff consistently failed to meet Defendant's 12-cars-per-month minimum sales expectation.[19]

---

[15] Although Plaintiff asserts that the "lead in exhibit is in lost lead status" such that it is a "poor example to make a point," Plaintiff does not dispute the asserted fact. Dkt. 47 at 33. Nor could he, given that he admitted as such in his deposition testimony. Dkt. 34-2 at Tr. 180:17-21 (Plaintiff confirming that he sees an entry reflecting "lead log by William James, sales rep changed from Ali Sami to Tommy Stith"). Accordingly, there is no genuine dispute of material fact.

[16] Plaintiff does not attempt to dispute the asserted fact. Rather, Plaintiff argues: "Profits placed in slush funds are not external factors. The money show [sic] to defense was placed in slush funds and siphoned off." Dkt. 47 at 34. Accordingly, there is no genuine dispute of material fact.

[17] Plaintiff concedes that there "may be a policy." Dkt. 47 at 34. Accordingly, there is no genuine dispute of asserted fact.

[18] Plaintiff asserts that he "challenge[s] this analogy" and that no commission would be changed unless James approved it. Dkt. 47 at 34. But Plaintiff does not cite any record evidence for this proposition. Moreover, Plaintiff does not dispute that he did not raise any commission disputes during his employment. Accordingly, there is no genuine dispute of material fact.

[19] Plaintiff does not dispute that he failed to meet the 12-car monthly minimum. Rather, he argues that this was due to retaliation and asks that the Court "[l]ook at the client logs where my completed deals were reassigned as retaliation." Dkt. 47 at 34. Plaintiff fails to cite any portion of the record or even to refer to a completed deal that was a later reassigned. *See Zaklit v. Glob. Linguist Sols., LLC*, 2014 WL 4161981, at *4 (E.D. Va. Aug. 19, 2014) ("This single line is insufficient to alert the Court of the arguments now advanced, and the Court was under no obligation to unilaterally research and provide support for such a claim."). Accordingly, there is no genuine dispute of material fact.

8

31. On or around March 2022, Defendant reprimanded Plaintiff when it found out that he had reached out to the Subaru manufacturer directly about a factory buyback.  In this instance, Plaintiff promised a customer a certain amount of money back on the factory buyback without authority or speaking to management.  When the factory did not authorize the amount that Plaintiff promised to the customer, he called the manufacturer directly to ask for more money.  This was in violation of the procedures related to buybacks.  Additionally, Defendant had to cover the difference between what the factory offered on the buyback and the amount Plaintiff promised the customer (causing a loss to Defendant).[20]

32. On or about January 24, 2022, Plaintiff had been working a deal with James for a VIP customer during which time James allegedly called Plaintiff a "black motherf****r" and there was lots of screaming and cursing.[21]

33. On February 2, 2022, Plaintiff emailed a complaint to Dent about the incident but did not make any mention of the words "black motherf****r" or otherwise raise any complaint related to race.[22]

34. Plaintiff's February 2, 2022 email states in relevant part:

I am coming to you because there is a pattern of unprofessional behavior from an employee/mgr. It is never ok to curse at people just because you think no one will ever tell. I spoke to several colleagues here and they all witness a dress down with profanity and threats about employment. Although I believe Stohlman is a great company, the behavior experienced should never be the norm and I have not reached out to human because I trust you more. I try everyday to respect everyone even when I'm being disrespected. We are all adults and threats and intimidation should be a thing of the past but lately it is front and center. Most people would just become disgruntled and bash the company but 1 know what was said is not a strike against Stohlman it is against the narrow minded individual that spoke the language. I understand people get tired and react a certain way but they should realize

---

[20] Plaintiff asserts that this is "not true" and that the declarant is "in accurate [sic] and lying under oath." Dkt. 47 at 35.  But Plaintiff does not cite to any record evidence, nor does he suggest that he has such record evidence as he states: "Pull the file." *Id.*  Nor does Plaintiff provide his own declaration regarding this incident.  In any event, Plaintiff only appears to be disputing whether Defendant lost money on the deal – not whether this was a violation of policy. *Id.* ("You lost not a dime on this one.").  Accordingly, there is no genuine dispute of material fact.

[21] Plaintiff asserts that January 24, 2022, was the date of the incident.  Although Plaintiff has failed to support this allegation with a citation to the record, the Court accepts Plaintiff's assertion in this regard.  The asserted fact has been modified to reflect this.

[22] Plaintiff asserts that this "tirade was told directly to Jaime and she knows the words that [were] relayed to her." Dkt. 47 at 36.  But, again, Plaintiff fails to cite to any portion of the record. *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'").  Accordingly, there is no genuine dispute of material fact.

recording devices and cameras paint a very telling story. I have learned that when I have a Stohlman article of clothing and name tag on I must act professional even away from this store. Service client had to witness a complete meltdown today.

35. Dent did not interpret this as a race-based complaint.

36. Manahee Lee, Finance Director for Defendant's Tysons location, investigated the complaint by coming to the dealership and talking to witnesses. Lee completed the investigation because Dent was on vacation at the time. He did not write a report.[23]

37. When Dent returned from vacation, she met with Plaintiff to follow up on his complaint, and Plaintiff told Dent that everything had worked itself out.[24]

38. Plaintiff avers that, when James became the Used Car Sales Manager, he mistreated Hispanic/Latino sales consultants by calling them names such as "border-jumpers," but this was not reported to Defendant.[25]

39. In April 2022, during an order which had to be returned due to a factory buyback, James allegedly said to Plaintiff: "Leave it to the black man to screw things up." This was not reported to Defendant.[26]

40. Starting in mid-2020 through April 2023, James allegedly held meetings that he called "motherf*** Tommy meetings." Plaintiff asserts that there were dozens of these such

---

[23] Plaintiff concedes that Lee conducted an investigation but notes that no report was produced. Accordingly, although the Court does not find it material, the Court so modifies the asserted fact and there is no genuine dispute of material fact.

[24] Plaintiff asserts that Dent's declaration is inaccurate, but Plaintiff cites to no contrary evidence in the record. *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'"). Accordingly, there is no genuine dispute of material fact.

[25] Plaintiff asserts without citation to any record evidence or any explanation: "The executives knew." Dkt. 47 at 38. But the Court cannot rely on Plaintiff's unsworn commentary. *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'"). Accordingly, there is no genuine dispute of material fact.

[26] Plaintiff asserts without citation to any record evidence that he spoke to "Tia" in human resources about this. Dkt. 47 at 38. But the Court cannot rely on Plaintiff's unsworn commentary. *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'"). Moreover, Plaintiff provides no details about when or in what manner he reported the matter to human resources. Accordingly, there is no genuine dispute of material fact.

10

meetings. These meetings and the name for these meetings was not reported to Defendant.[27]

41. Plaintiff further asserts that James called him a "stupid motherf****r" and referred to a customer as Plaintiff's "butt buddy." But Plaintiff did not report these incidents to Defendant.[28]

42. Plaintiff claims that he orally reported to Dent and Glenn-Scott that James "g[ot] bent out of shape" while working a potential sale together.

43. Plaintiff further claims that he orally reported to Dent and Glenn-Scott that James was "using vulgar language," yelled, or raised his voice.

44. Plaintiff alleges that James took customer leads and gave them to other sales consultants to keep them from reporting his mistreatment of Plaintiff.

45. Plaintiff admits that James would reprimand all of the sales consultants, including Plaintiff, if they received a poor customer survey.

46. Plaintiff admits that James used vulgar languages and would be loud and yell at other sales consultants.[29]

47. On Saturday morning, April 8, 2023, Defendant held a "beginning of the month kickoff [sales] meeting."

48. The meeting was attended by sales staff and staff managers.

49. During the meeting, Mike Cerqueria, the Used Car Sales Manager, and Tyler Wright, the New Car Sales Manager, went over the numbers for the month, then James spoke to the entire group.

50. During the meeting, James said, "You [Plaintiff] can only afford to each chicken and I [James] could get any bone-in steak at Morton's Steakhouse."

---

[27] Plaintiff asserts that James told "Tom Wimmer" about the name for these meetings. Dkt. 47 at 39. It is unclear who Wimmer is or when this is alleged to have occurred. Furthermore, Plaintiff cites to no record evidence supporting this allegation. *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'"). Accordingly, there is no genuine dispute of material fact.

[28] Plaintiff does not dispute the asserted fact. Indeed, Plaintiff states, "I can confirm." Dkt. 47 at 39. Accordingly, there is no genuine dispute of material fact.

[29] Plaintiff asserts that this would "[d]epend on color of skin." Plaintiff provides no further specifics and cites to no record evidence supporting this allegation. *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'"). Accordingly, there is no genuine dispute of material fact.

11

51. After the meeting, Plaintiff spoke with Dent and told her what happened during the meeting.

52. Plaintiff claims the meeting was humiliating because James said that Plaintiff could only afford to eat chicken. Plaintiff believed that the statement was racial in nature.

53. On April 12, 2023, Plaintiff emailed a complaint to Glenn-Scott. The complaint recognized that James treated all salespersons badly, stating that "this guy really things everyone should just bow to him" and "he even chastised his managers in the same room."[30]

54. In response, Glenn-Scott told Plaintiff that Defendant would investigate the complaint.

55. On April 14, 2023, Dent met with Plaintiff at the dealership as part of the investigation.

56. Defendant's management also discussed the April 8, 2023 meeting with James.

57. On April 14, 2023, Dent instructed James about the company hierarchy and the process for addressing performance issues amongst the staff, including Plaintiff. James stated that he was trying to motivate his sales staff to sell more with his comments. After the meeting, Defendant issued James a formal write-up for the lack of professionalism.

58. On September 12, 2023, Plaintiff filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission (the "EEOC").[31]

59. The EEOC Investigator noted that Plaintiff identified "other, male and female [sic] of different racial background who were treated similarly to [Plaintiff] by the GM." She determined that James treated everyone, not just Plaintiff, in the same manner.[32]

---

[30] Plaintiff asserts that this is a "false analogy" and that James treated "Blacks, Hispanics, Latinos as inferior people." Dkt. 47 at 42. But the quoted language comes directly from the emailed complaint that Plaintiff sent. Dkt. 34-7. Accordingly, there is no genuine dispute of material fact.

[31] Plaintiff asserts that the Charge was filed with the EEOC on May 12, 2023. Plaintiff cites no record evidence in support of this allegation. Importantly, Defendant attaches the EEOC Charge which reflects that it was digitally signed by Plaintiff on September 12, 2023. Dkt. 34-9. Moreover, in his Complaint, Plaintiff affirmatively alleges that the EEOC Charge was submitted on September 12, 2023. Dkt. 1 ¶ 6. Accordingly, there is no genuine dispute of material fact.

[32] Plaintiff asserts, "I talked about me and only me during that interview," but does not cite any matter in the record. Dkt. 47 at 44; *Williams*, 2024 WL 1261211, at *4 ("It is 'well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment . . . .'"). Moreover, Defendant has accurately recounted the investigator's findings. Dkt. 34-10. Accordingly, there is no genuine dispute of material fact.

12

60. On or around April 13, 2023, Dent met with Plaintiff and offered him a transfer to Defendant's Tyson's location.[33]

61. Plaintiff admits that, if he had transferred to the Tyson's location, he would have made more money.

62. During that meeting, Plaintiff told Dent that he was resigning his employment because he had an offer from another Subaru dealership.

63. On or around April 14, 2023, Plaintiff decided to leave his employment with Defendant. After his resignation, he sent an email to Defendant in which he denied an intention to pursue litigation against it and stated that he had "no grievances against Stohlman Automotive." Dkt. 34-11.[34]

64. Plaintiff claims that James was the only person at Defendant who was racially discriminatory towards him.[35]

65. Plaintiff admits that James never said that he did not like Plaintiff because of his race.

66. After reporting James's comments about chicken at the sales meeting, Defendant offered Plaintiff the option to work at a different location, but he declined.

67. Plaintiff refuses to identify what he believes he is owed in wage damages.[36]

---

[33] Plaintiff asserts: "She asked me to think about taking a position in Tyson[s] and she said take the weekend to think about it but Michael Cerqueira told me they wrote me up as a no show on Saturday April 15 and paperwork sent to Tyson[s] terminated for no show. Tia confirmed William James had submitted information that I was terminated and not eligible for rehire or transfer to Tyson's Corner location." Dkt. 47 at 44. Plaintiff's argument in this regard fails in three respects: (i) he fails to cite to any portion of the record; (ii) he did not previously dispute and appeared to concede Defendant's proposed asserted fact that he voluntarily resigned when he failed to appear; and (iii) he does not assert that, when Dent told him to think about the Tyson's transfer over the weekend, she also told him that he did not need to appear for work. Accordingly, there is no genuine dispute of material fact.

[34] Plaintiff again does not dispute the characterization of his resignation. Dkt. 47 at 45. His only response is: "I stated if there was a complete investigation, which it wasn't because they kept the harasser in place." *Id.* This does not dispute that he resigned and is otherwise belied by the contents of the email. Dkt. 34-11. Accordingly, there is no genuine dispute of material fact.

[35] Plaintiff now alleges that Cerqueira and Wright retaliated against him. Dkt. 47 at 45. He provides no further details and cites to no record evidence. Accordingly, there is no genuine dispute of material fact.

[36] Plaintiff does not dispute the asserted fact or provide a figure but responds by identifying the categories of damages he believes he has. Accordingly, there is no genuine dispute of material fact.

68. Plaintiff is currently employed as a sales consultant by the Safford Brown Subaru dealership in Manassas, Virginia.

69. Plaintiff does not have a specific calculation of his alleged loss of wages.

70. Plaintiff has not received any documentation from a medical professional supporting his claims for emotional distress alleged in this matter.

71. Plaintiff admitted that he has not attended any counseling appointments as a result of the emotional distress he is alleging in this matter. He admits he scheduled two appointments but did not attend them because he did not agree with the masking policy.

### III.  LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

### IV.  ANALYSIS

In his Complaint, Plaintiff asserted the following claims: (i) a hostile work environment based on race under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and the Virginia Human Rights Act (the "VHRA"); (ii) constructive discharge under Title VII, Section 1981, and the VHRA; and (iii) retaliation under Title VII, Section 1981, and the VHRA. Dkt. 1. Defendant argues first that Plaintiff's claims are time-barred. Dkt. 34 at 20. Defendant further

14

argues that it is entitled to judgment as a matter of law on each of the three counts, and that Plaintiff has no evidence of damages. *Id.* The Court will address each argument in turn.

> A.  Whether Plaintiff's Title VII and VHRA Claims are Time-Barred

Title VII requires a claimant to file an EEOC charge of discrimination within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). "If the statutory time period elapses between the allegedly discriminatory incident and the filing of the EEOC charge, the litigant is forever barred from Title VII relief." *Edwards v. Murphy-Brown, L.L.C.*, 760 F. Supp. 2d 607, 619 (E.D. Va. 2011). In the hostile work environment context, courts generally follow the "continuing violation doctrine" established by the Supreme Court of the United States in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), where the Court determined that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purpose of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period," *id.* at 105. Applying *Morgan*, district judges in this District have made clear that:

> If acts outside the statutory window contribute to a hostile work environment, the Court may consider all of those acts, so long as any act contributing to that same hostile work environment occurs within the statutory window. Such a timely-act "anchors" the previous acts that occurred more than 300 days before the charge, making them also timely under the continuing violation doctrine.

*Edwards*, 760 F. Supp. 2d at 620. Like Title VII, the VHRA also has a 300-day lookback period. Va. Code Ann. § 2.2-3907.

Here, Plaintiff asserts three different claims under Title VII and the VHRA: hostile work environment, constructive discharge, and retaliation. Plaintiff filed his EEOC Charge on September 12, 2023. Dkt. 34-9; Dkt. 1 ¶ 6. Thus, the applicable 300-day lookback period excludes conduct occurring before November 16, 2022. Although Plaintiff asserts that he filed his EEOC Charge on May 17, 2023, Plaintiff cites no evidence in support of such allegation, and his

15

allegation is belied by the EEOC Charge itself as well as his allegations in the Complaint. Thus, all conduct before November 16, 2022, cannot form the basis of any discrete claim of discrimination.[37] This specifically impacts Plaintiff's retaliation claim (Count III) because, as noted *supra*, the Court may consider conduct outside the statutory lookback period for purposes of a hostile work environment claim or the very similar constructive discharge claim as they relate to the environment as a whole. Accordingly, the Motion is granted in this regard.

    B.  Whether Defendant is Entitled to Summary Judgment on the Merits

Defendant seeks summary judgment on each of Plaintiff's three counts. As an initial matter, two of the counts, and each of the statutes that those counts rely on, are premised on race discrimination. *See* Dkt. 1 at 12-13 (alleging race discrimination under Title VII, Section 1981, and VHRA). In his Second Response, Plaintiff denies that he relies on his race or any protected characteristic as the basis for his claims. Dkt. 47 at 7. Specifically, Plaintiff states:

> The evidence prove[s] that the actions of William James led to the outcome of discrimination regardless of what color my skin is. The description of discrimination does not state African American or Black it states the unfair or unequal treatment of individuals or groups. Defense can use my race as their objective **but race will have nothing to do with this case and I did not file a single complaint based on a protected status**. Although the EEOC and office of human rights conducted investigations **there was not a single complaint filed that states because of a protected class I'm entitled to anything**.

*Id.* (emphasis added). Plaintiff's denial that any employee of Defendant acted against him based on a protected characteristic means that Plaintiff cannot prove his case under Title VII, Section 1981, or the VHRA because such protected status is an element of those claims. As this Court has previously noted, Title VII, Section 1981, and VHRA claims require that Plaintiff establish that he

---

[37] The following exhibits submitted by Plaintiff are all beyond the November 16, 2022 statutory lookback period limit: Dkt. 41-1, 41-2, 41-3, 41-4, 41-5, 41-6, 41-7, 41-10, 41-11, 41-13, 41-14, 41-15, 41-16, 41-17 (partially), 47-3, 47-4, and 47-23 (to the extent they relate to sales before November 16, 2022).

was a member of a protected class and that there is a reasonable inference that the Defendant acted based upon that protected class status. *See Abreu v. N. Am. P'ners in Anesthesia, LP*, 2023 WL 5959430, at \*10-11 (E.D. Va. Sept. 12, 2023); *Osman v. Youngs Healthcare, Inc.*, 2023 WL 2021703, at \*3 (E.D. Va. Feb. 15, 2023) ("It is well-established that the elements required to establish a prima facie case of discrimination are the same under Title VII and § 1981."). Thus, Plaintiff's arguments in the Second Response alone would be sufficient to entitle Defendant to summary judgment on Counts I and II. Nonetheless, in deference to Plaintiff's *pro se* status, the Court considers each of the Counts individually.

i.        *Hostile Work Environment*

To establish a hostile work environment under either Title VII, § 1981, or the VHRA a "plaintiff must demonstrate: (1) []he experienced unwelcome harassment; (2) the harassment was based on [his] . . . race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192-93 (4th Cir. 2019) (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)); *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 229 (4th Cir. 2022) ("The elements of a hostile work environment claim are the same under Title VII and 42 U.S.C. § 1981."). Stated differently, a plaintiff must plausibly plead that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). There is no precise formula for determining whether a work environment is "abusive" or "hostile"; such a determination can be made "only by looking at all the circumstances." *Id.* at 23. Moreover, a plaintiff "cannot create a

17

genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citing *Barwick v. Celotex Corporation*, 736 F.2d 946, 963 (4th Cir. 1984)).

Here, no reasonable juror could find on this summary judgment record that Plaintiff was subject to a hostile work environment because no reasonable juror could find that any harassment or adverse actions to which Plaintiff was subjected (although unprofessional and callous) were severe or pervasive. Plaintiff identifies two comments that were directly based on his race: (i) a remark in February 2022 where James called Plaintiff a "black motherf****r"; and (ii) a remark in April 2022 where James said "[l]eave it to a black man to screw things up." The only other incident that Plaintiff expressly attempt to tie to his race is James's statement: "You [Plaintiff] can only afford to each chicken and I [James] could get any bone-in steak at Morton's Steakhouse." But that comment is not related to Plaintiff's race. Indeed, such commentary appears to be more associated with Plaintiff's class or status within the hierarchical structure at Defendant. *See Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 782 (4th Cir. 2023) (finding plaintiff failed to establish a hostile work environment and holding "[r]ace is thus not always the reason a person uses 'thugs' [and] there is nothing in the record, beyond Plaintiffs' unsupported belief, suggesting that their race was the reason here").

Other allegations that Plaintiff raises appear consistent with James being a vulgar and unprofessional manager, such as his commentary regarding a "butt-buddy" and regular tirades. Indeed, Plaintiff concedes that James made "derogatory and insulting remarks against people he perceived as being inferior." Dkt. 47 at 7; *see also* Dkt. 34-7 (stating that "this guy really thinks everyone should just bow to him" and "he even chastised his managers in the same room"). And the summary judgment record does not support an inference that James's reassignment of leads or

18

splitting of commissions was race-based because Defendant had policies regarding those and Plaintiff conceded that he had leads from other sales associates reassigned to him. *See* Dkt. 34 ¶¶ 18, 20-25. The Fourth Circuit has cautioned that a plaintiff "cannot rely on [his] own 'conjecture' to impute a racial character to what appears to be neutral harassment" and judges in this District have warned that the antidiscrimination statutes are not intended to address "morality or vulgarity." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 409 (4th Cir. 2022); *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 848-49 (E.D. Va. 2002). In this regard, the Fourth Circuit has specifically found that allegations regarding diverted sales are insufficient to establish a hostile work environment absent some more obvious connection to a plaintiff's race. *See Robinson*, 70 F.4th at 782 ("Yet, without evidence, a reasonable person could not conclude that Plaintiffs' drop-off in sales was because they are Black.").

Importantly, both of the deplorable comments that are clearly associated with Plaintiff's race fall outside of the statutory lookback period, and there is no other race-based commentary to anchor those comments in the appropriate period. *See Edwards*, 760 F. Supp. 2d at 620. Moreover, even assuming *arguendo* that reliance on such statements was not time-barred, isolated incidents like these, although vile and repugnant, are not sufficient to establish severe or pervasive harassment. *See, e.g.*, *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010) (finding no viable hostile work environment claim where "another recruit did openly disparage Mexicans, [but] his repugnant remarks were made only two times in five months"); *Brown v. Bratton*, 2022 WL 173226572, at *10 (4th Cir. Nov. 30, 2022) (finding three race-based statements

19

to be "isolated and remote in time").[38]  Accordingly, summary judgment on Plaintiff's hostile work environment claim in Count I is appropriate.

### ii.    *Constructive Discharge*

A plaintiff may establish a constructive discharge by showing that her employer "deliberately made his working conditions intolerable in an effort to induce him to quit." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006).  But, as the Fourth Circuit has noted, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  *Id.*  In assessing whether a work environment is intolerable, the Fourth Circuit has instructed that a reviewing court must assess "whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,' . . . that is, whether [s]he would have had *no choice* but to resign."  *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (emphasis in original).  The question with respect to a constructive discharge claim is whether a plaintiff's circumstances were "intolerable."  *EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 144-45 (4th Cir. 2017).  As judges within this District have recognized, "constructive discharge claims are held to a high standard, and even truly awful working conditions may not rise to the level of constructive discharge."  *Lindsay-Felton v. FQSR, LLC*, 352 F.Supp.3d 597, 606 (E.D. Va. 2018).

---

[38] Plaintiff does allege that he was subjected to race-based harassment daily, but he does not support his assertion with an affidavit, declaration, deposition testimony, or any other admissible evidence such that the Court can appropriately consider it on summary judgment.  It is the non-moving party's obligation to come forward with such evidence to support his arguments and to attempt to create a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56.  Having failed to do so, Plaintiff cannot rely on his own unsworn statements to create a dispute of fact.  *Williams*, 2024 WL 1261211, at *4.  Moreover, Plaintiff's general allegation that he was subject to "daily" harassment is too conclusory and vague to defeat a motion for summary judgment.

Here, because Plaintiff has failed to establish that his circumstances are severe or pervasive, he likewise cannot establish that his circumstances were intolerable. *See Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018) (recognizing that the "'intolerability' standard governing constructive discharge claims is more stringent than the 'severe and pervasive' standard for hostile work environment claims"). No reasonable juror could determine on this summary judgment record that Plaintiff's circumstances rose to the level of intolerability, especially where the most obviously racial comments to which Plaintiff was subjected came almost a year before his resignation. Accordingly, the Motion will be granted with respect to Count II.

iii.    *Retaliation*

To state a *prima facie* case of retaliation under Title VII, a plaintiff must establish "(1) that he engaged in protected activity, (2) that the employer took a materially adverse action against him[,] and (3) there is a causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (internal citations omitted). A materially adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006). The resulting harm must be a "*significant detriment*" to the plaintiff and not "relatively insubstantial or trivial." *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Burlington N.*, 548 U.S. at 68) (emphasis in original).[39]

---

[39] The *prima facie elements* for retaliation claims under Section 1981 and the VHRA are identical to those under Title VII. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 272 (4th Cir. 2015) ("recognizing that elements of prima facie § 1981 and Title VII retaliation claims are identical."); *McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024) (recognizing that Title VII and VHRA claims are analyzed together "because Title VII and the VHRA use substantially identical language").

Here, Plaintiff has not established that he complained about racial discrimination such that he engaged in a protected activity protected by Title VII, Section 1981, or the VHRA. The only two dates on which Plaintiff alleges he made a specific complaint are February 2, 2022, and April 12, 2023. But neither of those complaints specifically identified any issues of racial discrimination. Dkt. 34-5; Dkt. 34-7; *Smith v. Virginia Hous. Dev. Auth.*, 437 F. Supp. 3d 486, 512 (E.D. Va. 2020) ("A general complaint that an employee feels as if he or she is being treated unfairly, does not rise to the level of a protected activity."); *Ruddy v. Bluestream Pro. Serv., LLC*, 444 F. Supp. 3d 697, 713 (E.D. Va. 2020) ("Plaintiff's general complaint of rudeness does not constitute protected activity and plaintiff therefore fails to satisfy the first prong of the *prima facie* test."). Accordingly, Plaintiff has failed to establish that he engaged in a protected activity under any of the statutes pursuant to which he seeks to bring a claim.[40]

Even assuming *arguendo* that Plaintiff's February 2, 2022 complaint to Dent constitutes a protected activity, Plaintiff fails to provide any record evidence that James had knowledge of it such that any of his subsequent conduct could be considered retaliatory. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) ("[W]e conclude that Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity."). Nor does Plaintiff establish that he suffered any adverse action as a result of

---

[40] Plaintiff alleges that he made other complaints that constitute protected activity, but he does not support his assertion with an affidavit, declaration, deposition testimony, or any other admissible evidence such that the Court can appropriately consider it on summary judgment. It is the non-moving party's obligation to come forward with such evidence to support his arguments and to attempt to create a genuine dispute of material fact. *See* Fed. R. Civ. P. 56. Having failed to do so, Plaintiff cannot rely on his own unsworn statements to create a dispute of fact. *Williams*, 2024 WL 1261211, at *4. Moreover, Plaintiff's general allegations without other information regarding the contents of those complaints and the dates on which those complaints are made are insufficient to create a genuine dispute of material fact.

22

any alleged protected activity.  As Defendant correctly notes, yelling, cursing, or criticism does not constitute an adverse action.  *See Munday v. Waste Mgmt. of N. Am., Inc*., 126 F.3d 239, 243 (4th Cir. 1997) (explaining that yelling and spying on an employee are not adverse employment actions because they do not affect "the terms, conditions, or benefits" of employment).  Plaintiff's allegations regarding written warnings in February 2022 are: (i) unsupported by the summary judgment record; (ii) time-barred; and (iii) not adverse actions under Fourth Circuit precedent. Dkt. 41 at 1 (asserting in unsworn document that, in February 2022, James instructed someone to "write me up"); *Smith*, 437 F. Supp. 3d at 510 (recognizing, "neither oral nor written reprimands constitute the sort of adverse employment action cognizable under Title VII unless [the] plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action.").  To the extent Plaintiff relies on lead reassignments or commissions, there is insufficient information in the summary judgment record to support what occurred, when, who was the decisionmaker, and whether such actions are time-barred.  Dkt. 41 at 2-3 (setting forth unsworn allegations with insufficient information and without citation to record evidence).  And to the extent any of those lead reassignments or commission changes occurred *after* November 16, 2022, they would lack causation with respect to Plaintiff's February 2, 2022 protected activity.  *See Lorenz v. Fed. Exp. Corp*., 2012 WL 4459570, at *11 (W.D. Va. Aug. 17, 2012) ("Regarding temporal proximity, the Fourth Circuit has ruled that when 'at least three to four months separated the [materially adverse employment action] . . . and the claimed protected activities' the time period was too long to establish a causal connection on the basis of temporal proximity alone.").

Further, assuming *arguendo*, that Plaintiff's April 12, 2023 complaint constituted a protected activity, Plaintiff cannot point to an adverse action.  Although Defendant offered Plaintiff

a transfer to the Tyson's location, there is not evidence in the record that such transfer was required nor is there evidence that it would negatively impact Plaintiff's terms or conditions of employment as the summary judgment record supports that Plaintiff would make more money at that location. Moreover, Plaintiff cannot rely on his voluntary resignation as an adverse action. *See Benjamin v. Sparks*, 986 F.3d 332, 352 (4th Cir. 2021) (holding that voluntary resignation is not an adverse action). Accordingly, Defendant is entitled to summary judgment on Count III, as no reasonable juror could determine on this summary judgment record that Plaintiff was retaliated against.

## V. CONCLUSION

In short, Plaintiff has failed to demonstrate any genuine issue of material fact, and Defendant is entitled to judgment on each count of the Complaint.

Accordingly, it is hereby ORDERED that the Motion (Dkt. 33) is GRANTED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff on each count of the Complaint and to place this matter among the ended causes.

To appeal this decision, Plaintiff must file a written notice of appeal with the Clerk of Court within 30 days of the date of entry of this Order. A notice of appeal is a short statement indicating a desire to appeal, including the date of the order that Plaintiff wants to appeal. Plaintiff need not explain the grounds for appeal until so directed by the court of appeals. Failure to file a timely notice of appeal waives Plaintiff's right to appeal this decision.

It is SO ORDERED.

Alexandria, Virginia
March 23, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge

24